SOL SIEGAL *et al.*, Plaintiffs-Appellees, *v.* HEALTH CARE SERVICE CORP., d/b/a Blue Cross-Blue Shield, Defendant-Appellant.

First District (2nd Division)   No. 78-1888

Opinion filed February 5, 1980.

Kirkland & Ellis, of Chicago (Donald J. Duffy, of counsel), for appellant.

Robert F. Lisco, of Lisco & Field, of Chicago (Sidney Z. Karasik, of counsel), for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This action was brought to recover benefits under a major medical insurance policy issued by defendant. Plaintiffs' complaint in two counts was predicated on a contract theory for breach of the medical insurance policy and a wilful tort theory for breach of implied duty to deal in good faith. The jury returned a verdict of $20,000 compensatory damages for

breach of contract and $55,000 punitive damages for the wilful tort. Defendant filed a post-trial motion seeking either judgment notwithstanding the verdict or a new trial. From the judgment on the verdict and the denial of the post-trial motions defendant appeals, contending that the proof was insufficient to support the jury verdict, and a new trial or directed verdict should have been granted; that punitive damages were improperly assessed against a not-for-profit corporation, Blue Cross-Blue Shield; and that certain errors in the admission of evidence and the presentation of instructions to the jury were committed by the trial court.

Defendant, Health Care Service Corporation, d/b/a Blue Cross-Blue Shield, issued a comprehensive major medical policy to plaintiff Sol Siegal which provided for family coverage. The initial policy of April 1, 1976, provided:

"(15) 'Covered Medical Expenses' means the regular and customary charges incurred by a Beneficiary for necessary services or other items, subject to the Exclusions of IV, as follows:

\* \* \*

(k) Private nursing services of an actively practicing nurse, other than a nurse who ordinarily resides in the Beneficiary's home, or is a member of the Beneficiary's immediate family, as follows:

\* \* \*

(2) Other than in a Hospital, services of a registered nurse (R.N.);

\* \* \*

ARTICLE IV—EXCLUSIONS

No benefits shall be provided hereunder on account of

\* \* \*

(6) Services or supplies not necessary to treatment of injury or illness; \* \* \*."

On April 1, 1977, plaintiffs' insurance group purchased a different plan which provided coverage, *inter alia*, for:

"(22) Private Duty Nursing Services

When services of an actively practicing registered nurse or licensed practical nurse, other than a nurse who ordinarily resides in a Member's home or is a member of the Member's immediate family, when the attending Physician verifies the medical necessity for active treatment.

ARTICLE V
EXCLUSIONS

A.  No payment will be made under Article IV of Part 'C' for any expenses incurred for items or services:

> (1) which are not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member * * *."

After the change the policy provided for the services of a licensed practical nurse in addition to the coverage already extended to the services a registered nurse might provide.

Sol Siegal's wife, plaintiff Marian Siegal, developed a serious degenerative neurological condition which was originally diagnosed as Parkinson's disease but later as Steele-Richardson Olszeuski Syndrome (otherwise known as progressive supranuclear palsy). In late 1976, she was hospitalized for treatment of burns. Following discharge from the hospital, her treating physician ordered skilled nursing care to be provided Mrs. Siegal. A private duty registered nurse was immediately engaged and a claim for services from December 2 through December 23, 1976, was submitted to and paid by Blue Cross. Plaintiffs presented a second claim accompanied by a doctor's certification that skilled nursing services were necessary on February 28, 1977. Plaintiffs continued to submit periodic claims thereafter, but Blue Cross after having paid the first claim, refused to honor any subsequent billings. During this period (beginning March 7, 1977), plaintiffs were asked to provide Blue Cross with the name of the nurse, her license number, what skilled services she was performing, the doctor's notes, two medical reports, itemized professional bills, and the nurse's notes. However, plaintiffs did not fully comply and all requested information, including letters by treating physicians dated July 22 and August 5, 1977, was not gathered and resubmitted with prior claims until September 5, 1977.

Dr. Collette Rasmussen, associate medical director of Blue Cross, first reviewed plaintiffs' claim file on September 22, 1977, nine months after the first claims were submitted. Upon review of the claims information, Dr. Rasmussen determined that although Mrs. Siegal might require a constant companion, the skills of a registered nurse were not medically necessary except for an allowance of one hour a day for prescribed exercises. She stated that her standard of review of medical necessity was not based upon the diagnosis of the doctor or his conclusion that a registered nurse was required. Instead, Dr. Rasmussen focused on whether skilled nursing care was necessary, interpreted as that which an intelligent adult even with teaching could not do. She made her determination based on two factors—what the doctor ordered and what the nurse actually provided. Both elements had to show the need for a skilled registered nurse. The "[d]octor could order a skilled service and the nurse could omit to provide it, so you have to have both." Since Rasmussen considered an examination of Mrs. Siegal and an inspection of

hospital records or neurologist's notes to be irrelevant to whether the nursing services as provided were skilled, she did not seek additional information from these sources. Dr. Rasmussen explained her actions: "It's what [the attending doctor] orders the nurse to do that determines whether that is skilled or not." Following her recommendation, a letter was sent to plaintiffs on September 28, 1977, informing them that Blue Cross had denied their claim.

At trial, three employees of Blue Cross testified to explain customary expediting procedures for claims and that routine procedures were followed in plaintiffs' case. Casimier Gaik, a self-employed insurance broker who administered the group plan under which plaintiff was covered, also testified, over defendant's objection, concerning common industry practice with regard to claims of this type and about his attempted help in expediting the Siegal claim. Gaik stated that over the years he had acted as a broker for several different insurance companies and was familiar with the various provisions of the individual policies. As an example, he said that the Travelers health insurance contract contained similar "medical necessity" provisions which other insurance carriers would interpret to accept the doctor's opinion as to what services or supplies were medically necessary in the treatment of his patient.

Gaik became aware of the Blue Cross request for nursing notes in April or May of 1977. On contacting the nursing agencies, he found that one did not keep notes, but Gaik provided Blue Cross with those records that were available. He also stated that the nurses are not legally required to keep notes and Gaik had never before actually encountered a situation where he had to go back and request such notes. As a broker for various insurance plans, he did not place too much weight on nursing notes, which he stated tend to be extremely misleading, because "[m]any of the ones we have reviewed more or less tells more or less [sic] what the nurse was doing to protect the nurse [from certain liabilities of their profession], as opposed to what the patient was doing."

Dr. Eugene Blonsky, a physician specializing in neurology, testified that he had conducted his first neurological exam on Mrs. Siegal in December of 1975. Her condition was diagnosed as Parkinson's disease. On February 22, 1977, he admitted Mrs. Siegal to the hospital and discovered during a brain scan that a stroke had occurred the previous day. He also noted that her condition appeared to be deteriorating, in that she had great difficulty in standing and walking, she had begun to fall frequently, and her eye movement had become increasingly paralyzed, at times fixed in an unblinking, straight-ahead staring position. It was during this stay that Dr. Blonsky rediagnosed her condition as Steele-Richardson Olszeuski Syndrome. Dr. Blonsky concluded that:

"My diagnosis in her case is Steele-Richardson Olszeuski

Syndrome and her prognosis is very poor. This condition is a total irreversible progressive condition and there is nothing I know of, medically or surgically, which will reverse or arrest the progress. There will be deterioration to the point where she will be not ambulatory, confined to a wheelchair or some other sitting position; there may be progressive changes in her intellectual status; problems with swallowing will become a serious difficulty and may require a feeding tube directly into the stomach in order to maintain her nutrition. I am of the opinion that this patient requires skilled nursing care."

He further testified that Mrs. Siegal:

"* * * needs skilled nursing care because she requires medication at specific intervals during the course of the day, which she is totally incapable of handling on her own; vital signs, blood pressure, pulse, respiration, etc., to be checked periodically; she requires physical therapy, exercise, walking and patterning activities, et cetera. She needs someone who can deal with problems which might arise if she were to choke or aspirate food or liquid into the trachea, which might seriously compromise her breathing and endanger her life. She needs someone who is alert to her problems and in a position to literally guard her."

In addition to the above reasons for requiring a registered nurse, Dr. Blonsky testified that he preferred speaking to a skilled nurse rather than attempting to monitor the patient through notes because he could get a narrative description from the nurse. He also stated that although a registered nurse was not the only person who could administer oral medications, problems could arise with Mrs. Siegal if the medications were not given by a skilled nurse. Dr. Blonsky communicated his opinion to Blue Cross in letters dated August 5 and November 17, 1977.

Sol Siegal, the patient's husband, testified that he practiced podiatry in conjunction with his ownership of a shoe store. At those times when a nurse was not present, he was able to minister to his wife's needs because of his medical training. One of the nurses who attended Mrs. Siegal before her stroke affirmed that her duties were substantially the same as those described in Dr. Blonsky's testimony.

Defendant contends that the trial court should have directed a verdict at the close of all the evidence in their favor. They claim that the testimony of Dr. Blonsky was self-contradictory and did not establish the medical necessity for or the factual basis of his opinion that skilled nursing services were required. Additionally, it is claimed that defendant's contrary evidence, as presented by Dr. Rasmussen, preponderated to the extent that all the evidence so overwhelmingly favored defendant that no contrary verdict could ever stand. Defendant cites no cases to lend

support to this conclusion as to the evidentiary weight of the conflicting testimony on count I for compensatory damages and makes no alternative claim that the verdict was against the manifest weight of the evidence but relies solely on the above-stated *Pedrick* test. See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

■■ Plaintiffs contend that there were two alternative bases upon which the jury could have decided that the nursing services were included in the Blue Cross coverage. First, the jury could have found that the reasons given by Dr. Blonsky were sufficient to provide a basis for his medical decision that services of a registered nurse were required. We stated the test for adequacy of the expert's recommendation in *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 179, 298 N.E.2d 289, as follows:

> "[T]he weight of an expert's opinion must be measured by the reasons given for the conclusion and the factual details marshalled in support thereof. [Citation.] The opinion of an expert is of value only when it is based upon and in harmony with facts which are capable of verification by the court [citation], and, where a factual basis is lacking, the opinion is entitled to little weight. [Citation.]"

Dr. Blonsky wrote two letters to Blue Cross (August 5 and November 17, 1977) detailing his reasons for prescribing the services of a registered nurse. He also testified at trial concerning his rationale. Similarly, in the November letter, Dr. Blonsky advised Blue Cross that his files were open to their inspection and that an examination of Mrs. Siegal would more than adequately support his medical conclusion. Neither of Dr. Blonsky's suggestions was acted upon by Blue Cross. Unlike Dr. Rasmussen, Blue Cross' reviewing physician, Dr. Blonsky, as the treating physician, was able to make his recommendation in the context of his knowledge of Mrs. Siegal's condition.

■■■ In workmen's compensation cases, where the primary issue often revolves around a conflict between the testimony of the claimant's physician and that of the employer's physician, it is well settled that the Industrial Commission, acting as the fact-finding body, has the explicit function of resolving the differences in the medical testimony. (*Health & Hospitals Governing Com. v. Industrial Com.* (1979), 75 Ill. 2d 159, 163-64, 387 N.E.2d 676; *Crow's Hybrid Corn Co. v. Industrial Com.* (1978), 72 Ill. 2d 168, 177, 380 N.E.2d 777.) The same rationale governs where a jury is the fact-finding body. (See, *e.g., St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289.) Moreover, once again in the parallel context of Industrial Commission cases, it is recognized that the trier of fact can legitimately attach greater significance to the testimony of a treating physician than that of a

reviewing doctor. (*Holiday Inns of America v. Industrial Com.* (1969), 43 Ill. 2d 88, 90, 250 N.E.2d 643.) Where there is conflicting medical testimony, it is not proper for an appellate court to overturn the resolution of that testimony by the trier of fact simply because an opposite inference might have been drawn. (See generally *Sterling Steel Casting Co. v. Industrial Com.* (1979), 74 Ill. 2d 273, 277, 384 N.E.2d 1326; *Fernandez v. Industrial Com.* (1978), 71 Ill. 2d 283, 286-87, 375 N.E.2d 81.) Accordingly, we find that if the jury based its verdict on a determination that Dr. Blonsky's letters and testimony established the medical necessity for a registered nurse, there is more than adequate support in the record for that conclusion. Dr. Rasmussen's testimony, when viewed in the light of the limited review upon which it was seemingly founded, *i.e.*, the nurses' notes, does not so preponderate in favor of defendant as to require a reversal of the jury's verdict.

■ The alternative basis upon which the jury could have found that defendant breached its contractual duty to plaintiff was that Dr. Blonsky's recommendation, when made in good faith and without fraud, was sufficient under the factual terms of the insurance policy to satisfy the criteria of "necessary services." In *Van Vactor v. Blue Cross Association* (1977), 50 Ill. App. 3d 709, 365 N.E.2d 638, we discussed the import of the attending physician's recommendation when disputed by the insurer. In *Van Vactor*, however, one of the provisions of the contract at issue specifically provided that the decision of medical necessity was vested solely in the treating physician. When construed in the context of other provisions allowing the insurer to examine the subscriber on books and records prior to paying claims, an ambiguity was created concerning the insurer's right to "second guess" the treating physician. The *Vactor* court followed the established rule that " '[a]mbiguous provisions or equivocal expressions whereby an insurer seeks to limit its liability will be construed most strongly against the insurer and liberally in favor of the insured' " (*Van Vactor*, at 715, quoting from *Bell v. Continental Assurance Co.* (1970), 123 Ill. App. 2d 274, 278, 260 N.E.2d 114), and found against the insurer. Although there is no such explicit provision under either policy in the case at bar that vests absolute discretion in Dr. Blonsky as treating physician, we feel that the jury could have found that his recommendation, absent substantial reasons for the insurer's rejection, was sufficient to demonstrate compliance with the requirements of each policy. Since the jury brought in a general verdict supported by sufficient evidence under the *Pedrick* standard, either ground is adequate for us to affirm the award of compensatory damages on count I. See *Fernandez v. Industrial Com.* (1978), 71 Ill. 2d 283, 286, 375 N.E.2d 81; see also *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294, 263 N.E.2d 103.

■■ Defendant has also challenged the admission of testimony by the

insurance broker Casimier Gaik on the ground that it was irrelevant. We find no merit in this contention. Defendant specifically objects to Gaik's statements concerning how other carriers interpret the "medical necessity" exclusion provision in their contracts differently than Blue Cross did in the instant case. Testimony about custom and practice in the industry, and as to the usual meaning of certain "words of art" in insurance contracts, is relevant to a jury's finding on the intent and expectations of the contracting parties and, indeed, may be a practical necessity for certain ambiguous phrases. The confusion is most pronounced where even within the trade, different meanings are ascribed to routine provisions. (*Cf. Gaunt v. John Hancock Mut. Life Ins. Co.* (2d Cir. 1947), 160 F.2d 599, 602, *cert. denied* (1947), 331 U.S. 849, 91 L. Ed. 1858, 67 S. Ct. 1736 ("A man must indeed read what he signs, and he is charged, if he does not; but insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion"); see also *Downing v. Wolverine Insurance Co.* (1965), 62 Ill. App. 2d 305, 317, 210 N.E.2d 603 (" 'The law, it is often stated, undertakes to enforce the reasonable expectations which arise out of conduct, relations and situations' ").) Thus we find no error in the admission of Gaik's testimony where an adequate foundation was laid for his statements.

Defendant also challenges the jury's award of punitive damages on the second count, tortious breach of contract, as being so overwhelmingly contrary to the evidence that it should not be allowed to stand. (See *Pedrick.*) Defendant maintains that there is no precedent for such an unusual award where, as here, routine claims procedures were followed.

Prior to 1975, Illinois did not recognize a cause of action for punitive damages arising out of a breach of contract. (See *Wallace v. Prudential Insurance Co. of America* (1973), 12 Ill. App. 3d 623, 629, 299 N.E.2d 344.) Nevertheless, in *Ledingham v. Blue Cross Plan* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *rev'd on other grounds* (1976), 64 Ill. 2d 338, 356 N.E.2d 75,[1] the Fifth District Appellate Court, while reversing the award of punitive damages in that particular case, noted that in a proper case such damages could stand. The court reasoned, based upon a California decision, *Fletcher v. Western National Life Insurance Co.* (1970), 10 Cal. App. 3d 376, 89 Cal. Rptr. 78, that where the conduct of the insurer was outrageous enough, punitive damages were appropriate. The *Ledingham* court cited *Fletcher* as illustrative of a pattern of conduct in which breach of contract could give rise to a cause of action in tort:

" '[T]hreatened and actual bad faith refusals to make payments under the policy, maliciously employed by [the insurer] in concert

---

[1] The supreme court had occasion to review only an issue of the taxing of costs.

with false and threatening communications directed to plaintiff for the purpose of causing him to surrender his policy or disadvantageously settle a nonexistent dispute * * *.' " (*Ledingham*, 29 Ill. App. 3d 339, 345-46, quoting from 10 Cal. App. 3d 376, 400, 89 Cal. Rptr. 78, 92.)

*Ledingham* also recognized a duty of good faith and fair dealing in the insured-insurer relationship. (See generally *Scroggins v. Allstate Insurance Co.* (1979), 74 Ill. App. 3d 1027, 393 N.E.2d 718 (discussing duty in context of refusal to settle).) Breach of this duty, as with the above "outrageous conduct" breach, the *Ledingham* court stated, can result in both tort and contract actions. See 29 Ill. App. 3d 339, 350.

Illinois cases subsequent to *Ledingham* have either affirmed its validity although declining its application in the particular case (*Delano v. Collins* (1977), 49 Ill. App. 3d 791, 796, 364 N.E.2d 716), or questioned its reasoning while refusing to accept its thesis. See *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373 (legislative remedies sufficient); see also *Grafs Beverages of Illinois, Inc. v. Tauber* (1977), 50 Ill. App. 3d 1047, 1052, 366 N.E.2d 150; *Urfer v. Country Mutual Insurance Co.* (1978), 60 Ill. App. 3d 469, 376 N.E.2d 1073. But *cf. Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 187, 384 N.E.2d 353 (reaffirming punitive damages where tort is separate and independent from breach of contract).

This opinion however, does not reach the issue of *Ledingham's* impact since, under any construction, the insurer's conduct here was not so outrageous or demonstrably in bad faith as to constitute a tort for which punitive damages are recoverable. None of the duplicity or malicious attempts and communications designed to cause plaintiffs to surrender their rights under the policy as alleged in the leading California case, *Fletcher*, is present here. Defendant requested routine supplemental claims information; plaintiffs did not provide it until late August and early September. Upon receipt of all requested data, including doctors' reports, defendant's reviewing physician evaluated and rejected the claims within approximately one month.

■■ Although defendant may reasonably be found in error by a jury for its conclusion that plaintiffs were not entitled to skilled nursing services within the terms of their policy, its conduct, albeit perhaps impersonal and bureaucratic, does not rise to the level of a tort. The wilful, vexatious or unreasonable conduct implicit in an award of punitive damages simply is not presented by the case at bar. Accordingly, we must remand to the trial court with directions to enter judgment for defendant on count II.

In view of our above holding we need not discuss those issues relative to punitive damage jury instructions. The other instruction challenged,

which pertains to construing ambiguous phrases against the insurer, is a fair statement of the law and relevant to the considerations of the jury which was to decide the meaning of defendant's contract. For the reasons stated above, the judgment, on the first count for actual damages, is affirmed, but, as to the second count for punitive damages, is reversed and remanded with directions to enter judgment for defendant.

Affirmed in part; reversed and remanded with directions in part.

PERLIN, P. J., and DOWNING, J., concur.