ARKANSAS BLUE CROSS-BLUE SHIELD, Inc.
*v.* W. D. TOMPKINS, Special Administrator
of the Estate of William C. LEE, Deceased

73-285 · 507 S.W. 2d 509

Opinion delivered April 8, 1974

Wright, Lindsey & Jennings, by: H. William Allen, for appellant.

Rosé, Nash, Williamson. Carroll & Clay, P.A., by: James H. Wilkins, Jr., for appellee.

JOHN A. FOGLEMAN, Justice. Appellee made claim against Arkansas Blue Cross-Blue Shield for nursing services rendered his decedent William C. Lee, who was a patient in St. Vincent's Infirmary in Little Rock for a total of 58 days on two different occasions during August, September, October and November 1971 at the direction of his physician, S. William Ross, M.D. The claim was made on a contract under the Federal Employee Health Benefits Program, administered by appellant. This suit was brought after appellant paid $675 for nursing services for the first ten days of the hospitalization but denied liability for any greater amount.

After hearing the testimony of Dr. Ross and that of Dr. George Mitchell, Medical Director and Vice-President for Medicare and Medical Services of Arkansas Blue Cross-Blue Shield, the circuit judge directed a jury verdict for appellee in the amount of $3,082.50, a penalty of $369 and costs including an attorney's fee of $1,000. Appellant contends that this action was improper, asserting that the trial judge had erroneously interpreted the contract and had failed to submit an issue of fact to the jury. In reviewing that action, we must view the evidence in the light most favorable to the appellant, without regard to credibility of the witnesses, and draw every reasonable inference in its favor. Gramling v. Baltz, 253 Ark. 352, 485 S.W. 2d 183; Little Rock Land Co. v. Raper, 245 Ark. 641, 433 S.W. 2d 836. When we do this, we find that there was substantial evidence to present a question of fact for the jury.

The pertinent contract sections follow:

PART 3

SUPPLEMENTAL BENEFITS

Article I—DEFINITIONS

(a) Subject to the exclusions and limitations set forth in Article III, covered medical expenses are usual, customary, reasonable and necessary charges incurred by a subscriber which are in excess of those for which benefits are provided in Parts I and II of this contract for the following services and supplies performed or prescribed by a physician:

\* \* \*

(10) Services of an actively practicing nurse as follows:

(a) In a hospital, services of a professional registered nurse (R. N.) or services of a licensed practical nurse;

\* \* \*

ticle III—EXCLUSIONS AND LIMITATIONS

No benefit shall be provided under this Part for:
\* \* \*

(p) Services of a special nurse which do not require the skills of a professionally trained nurse but consist primarily of services such as bathing, feeding, exercising or entertaining the patient; giving medication, or acting as a companion or sitter.

It is undisputed that appellee would be entitled to recover if it were not for the exclusion in Article III (p). We do not consider that section to be ambiguous, so rules of construction relating to resolution of doubts relied upon by appellee are inapposite. We take the clause to mean exactly what it says, i.e., that services of any nurse attending the beneficiary are excluded from the benefits payable under the policy if, regardless of the identity and qualifications of the person rendering them, they do not require the skills of a professionally-trained nurse, but consist primarily of services such as bathing, feeding, exercising or entertaining the patient, giving medication, or acting as a companion or sitter.

The critical question turns upon a determination whether the services for which the claim was made fall into this excluded category.

Dr. Ross, concededly an expert in the field of internal medicine with a background of considerable experience, research and study pertaining to arthritis and lupus erythematosus, was Lee's treating physician. According to his diagnosis, Lee's diseased condition was of a type from which it was possible that he could develop pathological fractures from normal, everyday activities, i.e., walking, sitting, reaching. Lee had brain trouble which involved periods of confusion during which he would be irrational, unreasonable and unresponsible and would, on occasion, be found going about his house while unclothed. Dr. Ross determined that the patient was unable, because of pain, to roll over in bed or to reach beyond his bedside. Lee could not be left alone because of the danger of his fracturing bones.

Dr. Ross said he had prescribed nurses around the clock to assist in reaching treatment goals of elimination of Lee's confused mental state, of bringing about a recovery from pain and of rehabilitating the patient so he could get back on his feet. This doctor attributed Lee's need for nursing services to the patient's inability to reach for a glass of water, or to call for a bed pan, and to the necessity for someone to attend to his every need, particularly during periods of confusion when Lee could not roll over in bed. According to Dr. Ross, a Licensed Practical Nurse has training in rolling a patient in bed, in giving him water without drowning him and in managing a bed pan for a patient with soft bones. Dr. Ross testified that he expected to get oral information from Lee's nurses as to how Lee was moving in bed, the extent of his discomfort, his ability to do exercises and the feelings and impressions of the nurses about him. Ross stated that he gave no specific written orders to the nurses on how to handle this patient, but did record that the patient had a fresh fracture, and a nurse with reasonable training would understand the necessity for special care. He admitted that the nurses' notes on this patient did not indicate the type of services he expected from them during the first period of Lee's hospitalization, except for the notation that the admission complaint was low back trouble. On the second hospitalization Dr. Ross' written orders stated "May have L.P.N.'s around the

clock." He also admitted that all prescribed medication was to be administered orally. It was Dr. Ross' opinion that Lee required the skills of professionally-trained nurses on all 58 days of his hospitalization.

Dr. Mitchell was the recipient of an award as the outstanding graduate in his class at the University of Arkansas Medical School, a Diplomate of Internal Medicine since 1963, a former instructor in the Department of Medicine at the University of Arkansas, a partner of Dr. Ross at the Little Rock Diagnostic Clinic for seven years, and an admitted expert in internal medicine. It is his duty to review questionable claims when medical knowledge is required. He reviewed Lee's medical records to determine whether the services of nurses required skill. According to Mitchell, it is traditional in medicine that the medical record is the key to what is happening to the patient and that great stock is placed in that record as truly and clearly reflecting what happens to the patient as to the care being given.

Dr. Mitchell gave examples of skills of registered and licensed practical nurses. They were: giving medicine in the vein or by shots; giving oxygen; inserting and placing catheters; dressing an open wound; feeding a patient through a tube in his stomach; using suction apparatus in the patient's mouth or upper respiratory system. In his professional opinion, the services rendered by Lee's private duty nurses were not covered by the contract, the services reflected by the medical records were not skilled services and the assurance of protection of the patient did not require skilled services rendered by a professionally-trained nurse. Mitchell testified that the medical records reflected no orders for any skilled services to the patient. In his opinion a lay person could have alerted the hospital nursing staff if the patient had difficulty or became unmanageable. He admitted that he had authorized the payment for nursing during the first 10 days of hospitalization, in spite of the fact that no skilled services were actually rendered, as a very liberal allowance, saying that it was possible that the skills of a professionally-trained nurse might have been necessary because one may be unable to anticipate what treatment is required in a case of this nature when the patient is first hospitalized.

When we draw all reasonable inferences favorably to

appellant, we find the testimony of Dr. Mitchell to constitute substantial evidence tending to show that the services performed by the nurses attending Lee did not require the skills of a professionally-trained nurse.

Appellee contends that we should affirm the trial court because appellant had paid benefits for services of registered or licensed practical nurses during previous periods of hospitalization of Lee, during which time the patient's maladies and afflictions were similar to those at the time of his later admissions to the hospital, except that on one previous occasion he underwent minor surgery and on the other he was in a semi-comatose condition. Appellee based his argument upon proffered testimony to which the trial judge had sustained an objection. Appellee argues, however, that this action by appellant estopped it from denying this claim. It is sufficient to say that the admitted exceptions could very well be the basis for a factual distinction which would eliminate any apparent inconsistency in appellant's interpretation of the contract at different times. At any rate, this issue was not raised in the pleadings, and the proffer of proof seems to have been made in chambers after the court had directed the verdict.

The judgment is reversed and the cause remanded for a new trial.

JONES and BYRD, JJ., dissent.

HARRIS, C.J., not participating.