[L.A. No. 31988. Jan. 2, 1987.]

JOHN S. SARCHETT, Plaintiff and Respondent, v.
BLUE SHIELD OF CALIFORNIA, Defendant and Appellant.

**COUNSEL**

Hassard, Bonnington, Rogers & Huber, Howard Hassard, William B. Sturgeon, Rick C. Zimmerman, B. Thomas French and Tyler G. Draa for Defendant and Appellant.

Munger, Tolles & Rickershauser, Daniel P. Garcia, Peter R. Taft and Lucy T. Eisenberg as Amici Curiae on behalf of Defendant and Appellant.

William M. Shernoff, Marian Haycock, Shernoff & Levine, Leonard Sacks and Roni Keller for Plaintiff and Respondent.

**OPINION**

**BROUSSARD, J.**—This dispute arose when defendant Blue Shield of California (Blue Shield) denied plaintiff John Sarchett's claim for hospitalization benefits in the amount of $1,203.05. Sarchett sued Blue Shield for the hospital expenses and also for a breach of the implied covenant of good faith and fair dealing. The trial court directed a verdict for Sarchett on breach of the covenant of good faith and fair dealing, and the jury awarded his hospital costs, $20,000 in compensatory damages and $80,000 in punitive damages. Blue Shield appeals from this verdict.

### FACTS AND PROCEDURAL BACKGROUND

In 1966, John Sarchett, a Los Angeles County employee, elected to be insured under a group policy provided by Blue Shield.[1] In January 1976,

---

[1] Blue Shield notes that it is a health care service plan rather than an insurance company. Because the distinction is immaterial for purposes of our decision, we discuss the issues in terms of insurance.

Sarchett was hospitalized for three days by his family physician, Dr. Bruce Van Vranken, who is a member physician of Blue Shield. Dr. Van Vranken testified that Sarchett, usually a healthy and robust person, reported symptoms during January of fatigue, tremor, disorientation, painful swelling and distension of the stomach and back, changing bowel habits and peculiar stools. His blood test showed low hemoglobin and low white blood cell counts. Sarchett's condition appeared to be deteriorating rapidly during January, and Dr. Van Vranken feared Sarchett might be suffering from a life-threatening bleeding duodenal ulcer or leukemia.

Blue Shield paid Sarchett's medical and diagnostic testing bills, but denied his claim for the hospital stay, amounting to $1,203.05. Its denial was based on two separate provisions of Sarchett's policy: (1) an exclusion for "[s]ervices when hospitalized primarily for *diagnostic purposes* or medical observation, rest or convalescent care . . ." (italics added) and (2) exclusion for services not "medically necessary."[2] The latter exclusion reads as follows: "Medical Necessity: Benefits will be provided under this contract only for such services, whether provided on an Inpatient or Outpatient basis, as are reasonably intended, in the exercise of good medical practice, for the treatment of illness or injury." Blue Shield contended that Dr. Van Vranken's orders for Sarchett's care in the hospital were inconsistent with a belief that Sarchett was seriously ill and hospitalized for medical treatment.[3]

Plaintiff, Dr. Van Vranken, and the hospital utilization review committee protested the denial of coverage. The matter was submitted to arbitration, but the arbitrator's award in favor of plaintiff was vacated by the superior court. The matter was then set for trial de novo in the superior court.

The trial court found that Blue Shield repeatedly denied Sarchett's claim without advising him of his contractual right to impartial review and arbitration. Sarchett and others acting on his behalf received several denial letters from Blue Shield, none of them mentioning the availability of review by anyone other than the single physician consultant who repeatedly denied Sarchett's claim. Only after six months of correspondence and repeated

---

[2] Similar exclusions appear in the subscriber's brochure under "Services Not Covered."

[3] For instance, Dr. Van Vranken's admitting orders allowed Sarchett to ambulate and to eat the regular house diet, and he did not order serial blood counts, regular monitoring of vital signs, multiple position blood pressure readings, placement of an intravenous line, blood typing and cross-matching in case a blood transfusion became necessary, nasogastric tube insertion to monitor internal bleeding, serial stool checks, or a barium enema—all of which steps Blue Shield claims should have been taken if the admitting physician actually suspected a bleeding duodenal ulcer or leukemia. Blue Shield asserts that Sarchett was suffering only from chronic anemia and a reaction to some "gall bladder pills" ingested in preparation for a gall bladder series, though Sarchett and Dr. Van Vranken claim the symptoms antedate the gall bladder tests.

protests did Blue Shield first mention the possibility of peer review.[4] This came only after the hospital utilization review committee lodged a protest, and only in a letter to that committee—not to Sarchett himself. This belated offer to submit the dispute to peer review was made conditional upon the production of further "solid" information in support of Sarchett's claim, although the review provision in the subscriber's brochure placed no conditions on the right to impartial review.

The trial court directed a verdict for Sarchett on breach of the duty of good faith and fair dealing. The court found that Sarchett's policy failed to reserve for Blue Shield the right to review the "medical necessity" of a procedure ordered by his physician and not excluded from coverage by the contract. It found that Blue Shield had violated the covenant of good faith and fair dealing by "disagreeing with the judgment of the treating physician to hospitalize his patient solely on the basis of retrospective review of hospital files . . . where the subscriber [was] not clearly informed of this procedure in the health plan." The trial court based its directed verdict on the fact that Blue Shield had failed to advise Sarchett of his contractual right to impartial review and arbitration in repeated denial letters to him. The jury awarded Sarchett $1,203.05 for his hospital costs, $20,000 in compensatory damages, and $80,000 in punitive damages.

## I.

The trial court found that the Blue Shield policy was ambiguous because it did not indicate who would determine when the diagnostic ser-

---

[4]The correspondence was as follows, all dates in 1976:

| | |
|---|---|
| March 22 | First denial letter from Blue Shield to Sarchett. |
| March 25 | Sarchett sends letter to Blue Shield protesting denial. |
| April 12 | Sarchett's physician, Dr. Van Vranken, sends letter to Blue Shield protesting denial of Sarchett's claim. |
| April 14 | Blue Shield sends letter to Sarchett requesting more information in order to reevaluate his claim. |
| May 20 | Sarchett sends letter to Blue Shield stating that his physician has already forwarded the requested information, and requesting that his claim be reevaluated. |
| June 29 | Blue Shield sends letter to Dr. Van Vranken explaining that Sarchett's claim has been reevaluated and again denied. |
| July 2 | Blue Shield sends letter to Sarchett notifying him that his claim has been reevaluated and again denied. |
| July 6 | Blue Shield sends another letter to Sarchett telling him that no payment can be made on his claim. |
| August 4 | Hospital utilization review committee of hospital where Sarchett was hospitalized sends letter to Blue Shield protesting denial of Sarchett's claim. |
| September 13 | Blue Shield sends letter to hospital utilization review committee reiterating denial of Sarchett's claim. For the first time, Blue Shield mentions possibility of impartial peer review of the claim, but only on condition that further "solid" information is produced to support the need for hospitalization. |

vices or medical necessity exclusion barred coverage. Construing that ambiguity in favor of the member, it concluded that he should be able to rely on the judgment of his treating physician as to the purpose and necessity of hospitalization, and that Blue Shield could not question that judgment. Blue Shield contends that the trial court erred in interpreting the policy, and that its right to review claims is inherent in the insurance contract. Sarchett, on the other hand, maintains that only the addition of an explicit statement asserting the insurer's right of retrospective review would cure the ambiguity and, going beyond the ruling of the trial judge, argues that regardless of policy language retrospective review should be banned as contrary to public policy.

We begin with the specific language of the policy. The diagnostic exclusion denies coverage for "[s]ervices when hospitalized primarily for diagnostic purposes or medical observation, rest or convalescent care." The "medical necessity" provision provides coverage "only for such services . . . as are reasonably intended, in the exercise of good medical practice, for the treatment of illness or injury." When the two provisions are read together, certain ambiguities appear. In some cases, for example, some diagnostic procedures may be so difficult or hazardous that hospitalization is medically necessary. In others a patient's medical condition may be so serious as to require hospitalization even though the physician is unable to treat that condition without diagnostic tests which ordinarily could be performed on an outpatient basis. Policy coverage for both cases is unclear.

At oral argument, however, counsel for Blue Shield explained that the diagnostic exclusion is intended as a subset of the implied exclusion for unnecessary medical treatment, and that the insurer would cover "medically necessary" hospitalization even if done for diagnostic purposes.[5] Consequently, coverage for plaintiff's hospitalization does not turn on whether he was hospitalized for diagnosis, but simply on whether hospitalization was "medically necessary." Furthermore, strict necessity is not required. The policy language requires only that the services be "reasonably intended . . . for the treatment of illness or injury." The intent in question is apparently that of the treating physician, and "treatment," Blue Shield acknowledges, includes hospitalization required by the subscriber's medical condition even if further diagnosis is essential for further treatment.

---

[5] Contrary to the assertion of the dissent, we do not maintain that counsel's concession eliminated ambiguity as to who decides whether a treatment was medically necessary. As we explain later in this opinion, we think the policy unambiguously provides that this decision will ultimately be made by a disinterested third party—a review committee, an arbitrator, or a court. We believe, instead, that counsel's concession resolved an ambiguity concerning the policy's substantive coverage in favor of the insured, thus making it unnecessary for us to employ established rules of construction to reach that same result.

Plaintiff's insurance coverage would therefore appear to depend upon three questions of fact: (1) whether Dr. Van Vranken ordered hospitalization with the intention of treating plaintiff's illness or injury, (2) whether the physician's intention was reasonable, and (3) whether that intention conforms to good medical practice. Blue Shield concedes the question of good medical practice, but disputes the other issues, claiming that Dr. Van Vranken did not reasonably believe plaintiff's medical condition called for hospital treatment.

Plaintiff, however, seeks to eliminate even these factual questions, arguing that the policy is ambiguous as to who decides whether hospitalization is medically necessary. As we have noted, the trial court agreed, and directed the jury that Blue Shield violated its duty of good faith and fair dealing by challenging the treating physician's determination of medical necessity.

Upon review of the entire policy, however, we find no ambiguity in this respect. It is true that neither the diagnostic exclusion nor the medical necessity provision provides expressly how coverage disputes will be resolved, but neither does any other exclusionary clause.[6] Instead, Blue Shield has provided a separate provision, entitled "Settlement of Disputes," which applies to all disputes under the policy. That section first provides that "[a] dispute concerning the therapeutic justification for any services rendered to the member shall be resolved by the decision of the appropriate review committee of that medical society . . . for the geographical area in which such services were provided. . . ." It then states that "all other disputes, including disputes with respect to the decisions of the medical society . . . shall be resolved . . . in accordance with the Rules of the American Arbitration Association."[7]

---

[6] Besides the exclusions at issue in this case, the policy also generally excluded coverage for, e.g., mental disorders, routine eye refractions, routine physical examinations, hospitalization for tuberculosis, physical therapy, dental services, organ transplants, and treatment for alcoholism and narcotism.

[7] The settlement of disputes provision reads in full: "In the event of a dispute between the Contractholder or a Member and the California Physicians' Service, with respect to any of the terms, conditions or benefits of this contract, the dispute shall be settled as follows:

"a. A dispute concerning the therapeutic justification for any services rendered to the Member shall be resolved by the decision of the appropriate review committee of that medical society which is a component society of the California Medical Association for the geographical area in which such services were provided, or, in the event that such services were provided outside of the State of California, then by such component society in the area where the Member resides or last resided in the State of California.

"All such disputes shall be settled in this manner before any arbitration proceeding under paragraph b. below is undertaken by or against the California Physicians' Service.

"b. All other disputes, including disputes with respect to the decisions of the medical society reached by such society in accordance with the provisions of paragraph a. above, shall be resolved as follows: the Contractholder or Member, by written notice to the California Physicians' Service, shall request that an arbitration proceeding be initiated for the

We find no ambiguity in this language relevant to the present case. The dispute between Sarchett and Blue Shield is "a dispute concerning the therapeutic justification" for plaintiff's hospitalization, and even if it were not, it would then be among the "other disputes" governed by the arbitration provision. The point is not that this dispute must be remanded to a medical review committee or an arbitrator—such remedies have been waived or exhausted, and the case was properly in the superior court. It is, instead, that since the policy itself provides unambiguously how disputes are to be resolved, including disputes concerning the "medical necessity" of hospitalization,[8] there is no room for the argument that the policy contains an ambiguity which, construed in plaintiff's favor, would vest the final determination of medical necessity in the treating physician.[9]

Sarchett relies on the decision of the Illinois Court of Appeal in *Van Vactor* v. *Blue Cross Association* (1977) 50 Ill.App.3d 709 [365 N.E.2d 638]. *Van Vactor* was a class action by members who had been denied coverage for hospitalization for oral surgery. The policy provided for payment of hospital bills incident to removal of impacted teeth where hospitalization was "medically necessary." The court held that since "nowhere does either the master contract or the brochure provide that a judgment on medical necessity for such inpatient hospitalization is required to be made by anyone other than the duly licensed treating physician as a condition to payment of benefits, there is no justification for the denial of benefits *solely* on the ground that the insurer disagrees with the honest judgment of the treating physician." (P. 642, italics in original.) The court then interpreted the policy to provide that the "determination of whether and to what extent hospital services are medically necessary is 'vested solely and exclusively in the judgment and discretion of the treating physician.'" (P. 647.)

---

settlement of such disputes in accordance with the Rules of the American Arbitration Association. It is also agreed that judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

"All such disputes shall be settled in this manner before any action at law is taken by or against the California Physicians' Service."

(A summary of this provision also appears in the insurance brochure.)

[8] The wording of the "medical necessity" provision itself supports this analysis. The clause refers to services *reasonably* intended for treatment, yet plaintiff's interpretation would leave the treating physician the sole judge of his own reasonableness. The clause also requires the "exercise of good medical practice," language which suggests an objective standard, not one under which the physician himself decides whether his intentions conform to good medical practice.

[9] Plaintiff accused Blue Shield of claiming that it has the final right to determine the "medical necessity" of treatment. But as we understand defendant's position, it is only claiming the right to contest plaintiff's claim, with the ultimate decision confided to an impartial review committee, arbitrator, or court.

The *Van Vactor* decision, however, stands alone. It has not been followed by any other court.[10] Numerous decisions from other jurisdictions take the position that "medical necessity" or similar policy language is an objective standard to be applied by the trier of fact, not a delegation of power to the treating physician. (See *Free* v. *Travelers Ins. Co.* (D. Md. 1982) 551 F.Supp. 554; *McLaughlin* v. *Connecticut General Life Ins. Co.* (N.D. Cal. 1983) 565 F.Supp. 434, 450 [applying California law]; *Haggard* v. *Blue Cross-Blue Shield of Alabama* (Ala.Civ.App. 1980) 401 So.2d 781, affd. (Ala. 1981) 401 So.2d 783; *Arkansas Blue Cross-Blue Shield, Inc.* v. *Tompkins* (1974) 256 Ark. 370 [507 S.W.2d 509]; *Group Hospitalization, Inc.* v. *Westley* (D.C.App. 1976) 350 A.2d 745; *Group Hospitalization, Inc.* v. *Levin* (D.C.App. 1973) 305 A.2d 248; *Goldfarb* v. *Associated Hospital Service* (1967) 55 Misc.2d 76 [284 N.Y.S.2d 347]; *Society of New York Hospital* v. *Burstein* (1964) 22 App.Div.2d 768 [253 N.Y.S.2d 753]; *Lockshin* v. *Blue Cross of Northeast Ohio* (1980) 70 Ohio App.2d 70 [24 Ohio Ops.3d 80, 434 N.E.2d 754].)[11]

We note in particular the last cited case, *Lockshin* v. *Blue Cross of Northeast Ohio, supra,* 434 N.E.2d 754. In that case Blue Cross denied a subscriber's claim for two days of private nursing care following a Cesarean section on the ground that care was ordered to "allay . . . misapprehension" (p. 757) and was not "necessary" within the purview of the insurance policy. "The trial court held that the term 'necessary' was ambiguous, vis-à-vis who must ultimately decide what is 'necessary.' Consequently, the trial court strictly construed the policy against the drafter and found for the claimant (plaintiff)." (P. 755.) The Court of Appeal, however, rejected this view, stating: "[A] function, basic to the insurer, is the right '. . . to determine whether . . . [a] claim should be allowed or rejected.' [Citation.] The function of reviewing claims is obviously reserved by the insurer and

---

[10] Although *Van Vactor was* cited with approval in *Carrao* v. *Health Care Services Corp.* (1983) 118 Ill.App.3d 417 [454 N.E.2d 781, 787-788], that decision rests on different grounds. The policy in *Carrao* contained no medical necessity provision, and the court held only that such a restriction could not be implied from the definition of hospital services or other policy language, nor inserted as a public policy device to protect against rising insurance costs.

[11] We note also *Siegal* v. *Health Care Services Corp.* (1980) 81 Ill.App.3d 784 [401 N.E.2d 1037]. The *Siegal* court distinguished *Van Vactor* as a case in which the policy explicitly vested the power to determine medical necessity in the treating physician. It then treated the question of medical necessity as a jury question, affirming a verdict finding coverage as supported by substantial evidence.

The court's discussion of *Van Vactor* seems erroneous. The policy in *Van Vactor* did not expressly vest authority in the treating physician; it said nothing about who decided the question of medical necessity, and it was the trial and appellate courts, construing that policy, which held that the good faith judgment of the physician could not be questioned. Nevertheless, in light of *Siegal* it is unclear whether the Illinois courts today would follow *Van Vactor* and direct entry of a judgment for the policyholder in a case in which a jury found lack of medical necessity.

implied by the mandatory process of submitting a proof of claim. [Citations.] Without such a right, an orderly establishment, administration and dispensation of insurance benefits would be virtually impossible." (P. 756.) "While the decision of a physician is both relevant and probative on the issue of necessity, it is not dispositive of the question. . . ." (*Ibid.*)

In short, we find the policy unambiguous on the question of who decides "medical necessity": in the event of a dispute the decision is made by an impartial review committee, subject to further review through arbitration. Since this is clearly set out in the settlement of disputes section of the policy, it is not necessary for the insurer, to avoid ambiguity, to repeat that language in the diagnostic exclusion or medical necessity clauses. We do not seek to discourage inserting such language into appropriate exclusions; a little judicious repetition may illuminate the meaning of the policy and avert controversy.[12] We hold, however, that the absence of such language does not preclude the insurer from challenging the medical necessity of hospitalization recommended by the treating physician. Thus we conclude that the trial court erred in directing a verdict that Blue Shield violated its duty of good faith and fair dealing by disagreeing with the judgment of the treating physician on retrospective review.

■ Plaintiff argues, however, even if the policy is not ambiguous upon close reading, it should still be construed in light of the "reasonable expectation of the insured." (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271 [54 Cal.Rptr. 104, 419 P.2d 168].) The subscriber under a Blue Shield policy, he contends, would reasonably expect to be covered for hospitalization recommended by the treating physician. We do not question this description of the subscriber's expectations, but we doubt that it arises from any belief that Blue Shield will cover all treatment recommended by a physician, however unreasonable the recommendation. Instead, the subscriber expects coverage because he trusts that his physician has recommended a reasonable treatment consistent with good medical practice. Consequently we believe the subscriber's expectations can be best fulfilled not by giving his physician an unreviewable power to determine coverage, but by construing the policy language liberally, so that uncertainties about the reasonableness of treatment will be resolved in favor of coverage.

---

[12]Some insurers include such language in the policy. For instance, in *Franks* v. *Louisiana Health Services & Indemnity Co.* (La.App. 1980) 382 So.2d 1064, 1066, the policy contained the following provision: "The fact that a physician may prescribe, order, recommend, or approve a service or supply does not, of itself, make it medically necessary or make the charge an allowable expense, even though it is not specifically listed as an exclusion." (Similar language appears in the policies quoted in *Haggard* v. *Blue Cross-Blue Shield of Alabama* (Ala.Civ.App. 1980) 401 So.2d 781, 782, and *Blue Cross and Blue Shield of Kentucky, Inc.* v. *Smither* (Ky.App. 1978) 573 S.W.2d 363, 364.)

Finally, plaintiff argues that, entirely apart from the policy language, the courts as a matter of public policy should bar insurers from refusing coverage for hospitalization ordered by the treating physician.[13] He points to the dilemma faced by the subscriber when his doctor tells him that hospitalization is necessary. Unless a physician himself, the subscriber lacks competence to question his doctor's recommendation. If he follows the recommendation, he takes the risk that the insurer may later deny coverage, leaving the subscriber liable for a hospital bill he cannot afford. Yet if he does not follow the recommendation, he may be foregoing needed treatment. Faced with this dilemma, most subscribers would follow their doctor's recommendation and risk the denial of insurance coverage. Subscribers purchase insurance not only for financial advantage, but to obtain the peace of mind and sense of security that follows from assured payment (cf. *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 434 [58 Cal.Rptr. 13, 426 P.2d 173]), and retrospective review frustrates those objectives.

There are, however, countervailing policy considerations. Sarchett had a choice between the Blue Shield plan, which offered him unlimited selection of physicians but provided for retrospective review, and alternative plans which would require him to choose from among a limited list of physicians but guaranteed payment. A holding that retrospective review is against public policy would narrow the range of choices available to the prospective subscriber, since it is unlikely that any insurer could permit the subscriber free selection of a physician if it were required to accept without question the physician's view of reasonable treatment and good medical practice. If the treating physician makes the final decision whether the treatment he prescribes is covered by the policy, inevitably a few will abuse that power

---

[13] Sarchett cites two decisions to support his contention, *Lopez* v. *Blue Cross of Louisiana* (La. 1981) 397 So.2d 1343, 1345, and *Weissman* v. *Blue Cross of Western New York, Inc.* (1982) 116 Misc.2d 1063 [457 N.Y.S.2d 392], revd. (1984) 126 Misc.2d 341 [482 N.Y.S.2d 659]. In *Lopez* the Louisiana Supreme Court upheld a judgment for a Blue Cross subscriber whose hospitalization claim for depressive mental neurosis was denied under a medical necessity clause. The court found that denial of the subscriber's claim based on a mere reading of the records, without examining her, was unreasonable despite the fact that the policy expressly provided that medical necessity would be determined "in the judgment of the Carrier." (*Id.,* at p. 1345.) The court imposed a statutory double penalty for Blue Cross' wrongful denial of the claim.

*Weissman* found unconscionable a contract clause providing that private nursing services would be covered "only if Blue Cross and Blue Shield, in their sole judgment determine that the medical condition of the member requires private duty nursing care." (*Id.,* 457 N.Y.S.2d at p. 394.) The court found that the health policy was a contract of adhesion and that "no reasonable person would accept these terms unless they had to accept the coverage due to necessity," since "the entire decision [whether the disputed care was necessary] will be based on the review by the party who may be paying for the services." (*Id.,* at p. 396.)

Both cases are distinguishable from the present case. Sarchett's policy did not vest the insurer with final authority to decide questions of medical necessity, but provided for decision by an impartial review committee and arbitration.

by overutilization of medical procedures, imposing excessive costs on the insurer.

This view finds support in the decision of the Kentucky Supreme Court. In *Blue Cross and Blue Shield of Kentucky, Inc.* v. *Smither, supra,* 573 S.W.2d 363, the policy covered "medically necessary" hospital services, and warned expressly that the fact that a physician may recommend a service does not of itself make that service medically necessary. Unable to argue ambiguity in the policy, the subscriber nevertheless contended that the decision of the treating physician should always control the question of medical necessity, and that contrary views of nontreating physicians were insufficient to raise a triable issue of fact. The court commented: "Smither's argument is, in essence, that the only medical advice the patient has concerning his hospital stay is that provided by the treating physician, and therefore his opinion should be treated as correct and not be subject to contradiction. We do not believe a treating physician should be placed in this unassailable position. One need only look to the Medicare and Medicaid System for alleged evidence of fraud which may occur on the part of doctors and other persons in the medical care professions, if their decisions are always assumed correct." (P. 365.)

Both the federal Medicare program (42 U.S.C. § 1395y (a)) and the state MediCal program (Welf. & Inst. Code, § 14110, subd. (e)), which permit the patient free choice of physician, also contemplate retrospective review. We cannot declare contrary to public policy a feature found necessary whenever the public, through its representatives, itself sets out the terms of a health insurance program.

In summary, we appreciate the plight of the subscriber, forced to decide whether to follow his doctor's recommendation without assurance that his policy will cover the expense. We do not, however, believe it would be alleviated by requiring the insurer to insert redundant language into the policy to make doubly clear to the subscriber that he really is in a dilemma and cannot count on coverage. And although a judicial ruling that retrospective review violates public policy would protect against retrospective denial of coverage, subscribers would pay the price in reduced insurance alternatives and increased premiums.

The problem of retrospective denial of coverage can be reduced through the growing practice of preadmission screening of nonemergency hospital admissions. When such screening is not feasible, as in the present case, we think the best the courts can do is give the policy every reasonable interpre-

tation in favor of coverage.[14] We trust that, with doubts respecting coverage resolved in favor of the subscriber, there will be few cases in which the physician's judgment is so plainly unreasonable, or contrary to good medical practice, that coverage will be refused.

## II.

█ The second ground for the trial court's finding of a violation of the good faith duty was that Blue Shield repeatedly denied Sarchett's claim for hospital benefits without advising him of his contractual right to impartial review and arbitration of the disputed claim. As mentioned above, Sarchett's policy entitled him to review and arbitration of any dispute over "the benefits, terms or conditions of this plan." Nevertheless, Blue Shield's denial letter was couched in terms of finality. The short letter concluded: "*We are sorry that we cannot be of more help to the subscriber in this instance,* but point out that we must adhere closely to the terms of the subscriber agreement in order to keep dues at a reasonable level." (Italics added.) The italicized language could be read, in the absence of any mention of appeal procedures, as a statement that no further recourse may be had.

Blue Shield responded to Sarchett's protests with further categorical denials instead of offering to submit the claim to the impartial dispute-resolution mechanisms required by the contract. Finally, after six months of correspondence and repeated protests from Sarchett and others acting on his behalf, Blue Shield offered to submit the claim to peer review *only* more "solid" information were provided, even though Sarchett claimed that all relevant information had already been furnished to Blue Shield. Blue Shield had no right to place any conditions on Sarchett's access to impartial review of his claim, since his policy provided unconditionally that "dispute[s] *shall* be resolved" by review and arbitration. Furthermore, Blue Shield never advised Sarchett himself of his review rights, but instead mentioned them to the utilization review committee of the hospital in which Sarchett had been hospitalized, and only after intervention by that committee. This offer did not disclose that peer review was a matter of right under Sarchett's contract.

In *Davis* v. *Blue Cross of Northern California* (1979) 25 Cal.3d 418 [158 Cal.Rptr. 828, 600 P.2d 1060], we held that "the insurer's implied duty of good faith and fair dealing include[s] a responsibility to inform its insureds

---

[14] The rule requiring interpretation of insurance policies in favor of coverage applies even if the policy, negotiated on a group basis, is not a contract of adhesion. (*McLaughlin* v. *Connecticut General Life Ins. Co., supra,* 565 F.Supp. 434, 448 [applying California law]; *Jones* v. *Crown Life Ins. Co.* (1978) 86 Cal.App.3d 630, 639, fn. 3 [150 Cal.Rptr. 375, 6 A.L.R.4th 826].)

of their rights under the policy's arbitration clause." (*Id.,* at p. 428.) In *Davis,* Blue Cross breached the covenant of good faith and fair dealing by attempting to compel arbitration after subscribers had filed suit against it for denial of claims. The basis of the breach was that Blue Cross had earlier failed "timely or adequately to apprise them of the availability of the arbitration procedure." (*Id.,* at p. 424.) The trial court found that "*even after learning that its insureds did not agree with its determinations as to the benefits available under the policy, Blue Cross had failed to bring the arbitration procedure to its insureds' attention. Instead it had simply reiterated in unequivocal terms its rejection of the insureds' claim.* [¶] The [trial] court found that in this context Blue Cross' failure to inform its insureds of the policy's arbitration provision amounted to *an 'implied misrepresentation . . . that such subscribers have no recourse but to accept the Blue Cross determination. . . .'* Indeed, the court additionally determined that Blue Cross had adopted its course of conduct 'for the purpose of inducing subscribers to give up their rights under the Blue Cross insurance contracts.' " (*Id.,* at p. 426, italics added.)

Blue Cross argued that "the inclusion of the arbitration clause in the hospitalization policy should have been sufficient to put an insured on notice of the availability of arbitration and that it was under no additional duty to call such a remedy to its insured's attention or to explain how the remedy could be invoked." (*Id.,* at p. 427.) We responded that "[i]n advancing this contention, Blue Cross ignores the special nature of the insurer-insured relationship and the resultant duties which an insurer owes to its insureds. [Citations.]" (*Ibid.*) Among those duties, we stated, is the duty of "each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." Thus, "[the insurer] . . . must give at least as much consideration to the [insured's] interest as it does to its own.' [Citation, italics omitted.] [¶] One important facet of the insurer's obligation to give the insured's interest 'as much consideration . . . as it does . . . its own' is the duty reasonably to inform an insured of the insured's rights and obligations under the insurance policy. *In particular, in situations in which an insured's lack of knowledge may potentially result in a loss of benefits or a forfeiture of rights, an insurer has been required to bring to the insured's attention relevant information so as to enable the insured to take action to secure rights afforded by the policy.*" (*Id.,* 25 Cal.3d at pp. 427-428, italics added.)

We appreciate the concern, voiced by the dissent, that it may appear inconsistent for us to hold that an arbitration clause is clear and conspicuous, and therefore binding on the subscriber, but that Blue Shield was in bad faith because it failed to call his attention to the clause. The problem, however, disappears when each holding is viewed in context. When a court

is reviewing claims under an insurance policy, it must hold the insured bound by clear and conspicuous provisions in the policy even if evidence suggests that the insured did not read or understand them. Once it becomes clear to the insurer that its insured disputes its denial of coverage, however, the duty of good faith does not permit the insurer passively to assume that its insured is aware of his rights under the policy. The insurer must instead take affirmative steps to make sure that the insured is informed of his remedial rights.[15] (*Davis* v. *Blue Cross of Northern California, supra,* 25 Cal.3d 418.)

In the present case, Blue Shield failed to bring relevant information about the right to impartial review and arbitration to its insured's attention at the appropriate time. In *Davis* the policy's arbitration provision was obscurely placed in fine print, whereas here it was adequately set out with a bold-face heading. However, Blue Shield had reason to know that Sarchett was uninformed of his rights, since he repeatedly protested the denial without demanding review by an impartial panel of physicians. Blue Shield nevertheless denied Sarchett's claim several times without mentioning his right to review by anyone other than the single hired consultant who initially and repeatedly denied the claim. This course of conduct appears designed to mislead subscribers into forfeiting their contractual right to impartial review and arbitration of disputed claims, and therefore we must affirm the trial court's ruling on this issue.

## III.

After granting plaintiff's motion for a directed verdict, the court instructed the jury that defendant had breached its duty of good faith and fair dealing in three respects: (a) by failing to pay the hospital bill, (b) by disagreeing with the judgment of the treating physician solely on the basis of retrospective review of the hospital files, and (c) by failing timely to advise plaintiff of his right to peer review and arbitration. The court declined to direct a verdict that defendant failed to conduct a proper investigation of plaintiff's claim.

We have concluded that instructions (a) and (b) were erroneous because they took from the jury the factual question whether plaintiff's hospitalization was reasonably intended for the treatment of illness or injury. The court did not err in directing a verdict that defendant's failure to advise its subscriber of his right to peer review and arbitration breached its duty of

---

[15] In some cases it will be clear that the insured knows his rights under the policy; for example, the insured's claim may refer to such remedies. When in doubt, however, the insurer should advise the insured of his rights under the policy.

good faith and fair dealing. It is, however, uncertain whether plaintiff sustained any damages independently attributable to this breach. Certainly if the jury had determined that defendant was not liable for the claimed benefits and that defendant's only breach of duty was its failure to provide timely advice respecting plaintiff's remedial rights, it is unlikely that the jury would have awarded plaintiff $100,000 in compensatory and punitive damages.

We conclude that the judgment must be reversed, and the case remanded. At retrial, the court should instruct the jury that defendant breached its duty of good faith and fair dealing by failing to advise plaintiff of his right to peer review and arbitration.

The judgment is reversed, and the matter remanded for further proceedings in accordance with the views expressed in this opinion. The parties shall bear their own costs on appeal.

Grodin, J., and Panelli, J., concurred.

**LUCAS, J.,** Concurring and Dissenting.— ▮▮▮ I concur with the majority's holding that the retrospective review provisions of the policy at issue here are unambiguous and enforceable. I dissent, however, from the majority's extension of the holding in *Davis* v. *Blue Cross of Northern California* (1979) 25 Cal.3d 418 [158 Cal.Rptr. 828, 600 P.2d 1060].

First, I note that *Davis* dealt only with whether Blue Cross had waived its right to compel its insureds to submit their disputes to the arbitration process. It did not address the question of whether the insurer's conduct gave rise to damages for a breach of the duty of good faith and fair dealing. The majority assumes that such relief may be available.

Moreover, as the majority acknowledges, the arbitration provision under review in *Davis* "was obscurely placed in fine print, whereas here it was adequately set out with a bold-face heading." (*Ante,* at p. 10.) Nonetheless, the majority finds that because Blue Shield "had reason to know that Sarchett was uninformed of his rights" (*ibid.*), it was further required affirmatively to assure that Sarchett knew of his remedial rights. Sarchett testified, however, that he had a copy of his insurance policy booklet outlining his rights and that he had reviewed the booklet before deciding to select Blue Shield as his insurer. The information was at hand and Sarchett's failure to make use of it was not due to any fault of, or deception by, the insurer.

My colleagues first observe that the arbitration clause here was indeed "clear and conspicuous," but nonetheless find that although Sarchett is

therefore bound by its terms, Blue Shield had a further duty to explain the terms and conditions of the insurance contract. The majority's conclusion that Blue Shield breached its duty of good faith relies on Blue Shield's statement to Sarchett that "We are sorry that we cannot be of more help to the subscriber in this instance" and its attempts to "place conditions" on the insured's access to peer review when such review was a matter of right under the contract. The situation here, however, differed from that in *Davis* because the arbitration clause was "adequately" displayed in the actual policy of insurance to which Sarchett unquestionably had access. The court in *Davis* noted that "The trial court . . . found that in the absence of timely and adequate advice as to the arbitration procedure the average insured in all likelihood would not know of *a right to arbitration buried in an obscure provision of a hospitalization policy.*" (25 Cal.3d at p. 429, italics added.) As the majority concludes, however, the provision here simply did not suffer from the same disability.

Moreover, in *Davis,* the trial court "found that Blue Cross knew that in many instances its insureds would not be aware of the arbitration clause and that, despite this knowledge, Blue Cross deliberately decided not to inform its insureds of the arbitration procedure." (*Id.,* at p. 430.) This practice effectively turned arbitration into a unilaterally available procedure effectively utilized only when the insurer deemed it appropriate. (*Ibid.*) In this case, however, there was no similar finding by the court, which instead focused in this context solely on the content of Blue Shield's letters of denial. If, indeed, the arbitration clause contained in the insurance policy here was "adequately set out" as the majority agrees, then it seems to me that the insurer sufficiently discharged its duty to inform the insured of his rights.

Will the next "logical" step in the majority's progression be to require an insurer to monitor its insureds to assure that they take advantage of every possible benefit of their policies? For example, if an insurer is aware that an insured has regular treatments and regularly submits bills for those treatments, is the insurer obligated to contact and remind the insured of coverage if the pattern of submitting bills is interrupted? Should insurers routinely send reminder notices to insureds advising them that they should submit their bills for insurance purposes? These suggestions seem all too consistent with the majority's approach here, with which I cannot agree. Once the insurer has provided adequate notification of the appropriate benefits and procedures in the policy, in my opinion it has fulfilled its affirmative responsibilities absent any active misrepresentation or fraud.

In sum, Blue Shield informed Sarchett of his rights in adequate fashion. Once it had done so, it was not required to further monitor its insured's

conduct. The role of an insurer should be to provide clear, accurate and adequate information to its insureds; once it has done so, it should not have to act as a paternalistic overseer.

I would reverse the trial court's judgment in its entirety without the qualification adopted by the majority.

**MOSK, J.**—I dissent to the conclusion reached in Part I of the majority's opinion. In my view, the policy is ambiguous because, as the trial court found, it does not state that Blue Shield had the right, on the basis of a retrospective review, to disagree with the judgment of the treating physician to hospitalize Sarchett.

The majority admit that the diagnostic exclusion is ambiguous when read in the light of the medical necessity exclusion. However, because of an explanation offered by Blue Shield at oral argument, the majority fail to apply the usual rule of interpreting ambiguous language in favor of the insured. But the question of ambiguity cannot be determined from the 11th-hour concession of an insurer before this court as to the meaning of the policy. It must be decided from the terms of the policy itself—terms which the majority concede are ambiguous.

The interpretation now advanced by Blue Shield, i.e., that the diagnostic exclusion is a subset of the implied exclusion for unnecessary medical treatment, and that it would cover medically necessary hospitalization even if done for diagnostic purposes, is not evident from the policy or the subscriber's brochure, which lists 16 categories of "Services Not Covered." The first is the diagnostic exclusion, and the last the "medical necessity" exclusion. There is no indication in the policy that one has any relation to the other. In my view, therefore, the ambiguities in the policy recognized by the majority should be resolved against Blue Shield, in accordance with the usual rule.

Nor do I agree with the majority's second reason for finding that the "medical necessity" exclusion is unambiguous. They conclude because the policy contains a provision that disputes relating to the "therapeutic justification" for services are to be resolved by a review committee, a subscriber is unambiguously notified that Blue Shield may second-guess the subscriber's physician on the issue of medical necessity.

An exclusionary clause in a policy must be "conspicuous, plain and clear." (*State Farm Mut. Auto. Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193, 202 [110 Cal.Rptr. 1, 514 P.2d 953].) The burden is on the insurer to "phrase exceptions and exclusions in clear and unmistakable language"

(*Harris* v. *Glens Falls Ins. Co.* (1972) 6 Cal.3d 699, 701 [100 Cal. Rptr. 133, 493 P.2d 861]), and to "draft its policy to avoid any misinterpretation by the average layman" (*Jacober,* 10 Cal.3d at p. 207). These rules must be applied with special care in the present case, since the exclusion which Blue Shield seeks to invoke amounts to a "vast, additional exclusionary condition to coverage." (*Van Vactor* v. *Blue Cross Association* (1977) 50 Ill.App.3d 709 [365 N.E.2d 638, 644].)

The provision relating to resolution of disputes does not meet the foregoing standard. It does not state that Blue Shield reserves the right to second-guess the judgment of the subscriber's doctor as to medical necessity. At most, it allows the subscriber, if he ponders the subject at length, to draw an inference that because there exists a right to review of disputes concerning "therapeutic justification" for services, Blue Shield may challenge the judgment of his doctor. On the other hand, the provision relied on by the majority does not even appear on the same page in the subscriber's brochure as the "medical necessity" exclusion. Thus I do not see how it can be said that the power which Blue Shield seeks to exercise is set forth in language clear and unmistakable to the average layman.

In addition, there is a significant incompatibility between the conclusions reached by the majority in Part I and Part II of the opinion. Part I holds that the provision relating to resolution of disputes unambiguously states that Blue Shield reserved the right to second-guess the judgment of Sarchett's doctor as to medical necessity. In Part II the majority decide that Blue Shield was guilty of bad faith because it must have known that Sarchett was ignorant of that procedure and Blue Shield violated its duty to bring it to his attention.[1] Nevertheless, they conclude the existence of the provision in the policy precludes Sarchett from successfully challenging Blue Shield's failure to reserve the right to determine after the fact whether his hospitalization was medically necessary. My colleagues fail to explain how a policy provision of which Sarchett had neither actual nor constructive notice can serve as the basis for its holding in Part I.

Finally, I am unable to concur in the determination of the majority that Sarchett did not have a reasonable expectation of coverage. The opinion states a subscriber could not reasonably expect that Blue Shield would cover all treatment recommended by his physician "however unreasonable the recommendation." A subscriber, unless he is knowledgeable in medical science, is unable to assess the reasonableness of his physician's recommen-

---

[1] I agree with the majority that Blue Shield violated the duty of good faith by its failure to advise Sarchett of his contractual right to arbitration, and that the trial court properly granted summary judgment to Sarchett on this ground. I disagree, however, with the majority's doubt that the award of damages on this ground was justified.

dation, or hospitalization. Since in this sense he is controlled by the opinion of his doctor, it is not unreasonable for him to expect that his insurer would likewise be bound by his doctor's judgment regarding the necessity for hospitalization, absent clear notification to the contrary.

The failure of Blue Shield to make clear its claimed right to decide after-the-fact that hospitalization was not a medical necessity deprives a subscriber of his opportunity to make a meaningful selection between various available types of health plans. If the policy and the brochure had made it known to Sarchett that Blue Shield claimed this right, he could have made a meaningful choice between the plan offered by Blue Shield and one with a limited choice of physicians but guaranteed payment. In my view, Sarchett should not be personally burdened with medical expenses which he could have avoided if Blue Shield had fulfilled its duty to make clear the important qualification of coverage which it belatedly advances in this case.

I would affirm the judgment.

Bird, C. J., and Reynoso, J., concurred.

Appellant's petition for a rehearing was denied February 24, 1987, and the opinion was modified to read as printed above.